IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BARINE DEEZIA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:17CV3033 |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF LINCOLN, GREGORY | ) | **MEMORANDUM** |
| GRAHAM, Lincoln Police | ) | **AND ORDER** |
| Department Officer, AARON PETH, | ) | |
| Lincoln Police Department Officer, | ) | |
| TREY WAYNE, Lincoln Police | ) | |
| Department Officer, ANDREW | ) | |
| WINKLER, Lincoln Police | ) | |
| Department Officer, MARK | ) | |
| MOORE, Lincoln Police Department | ) | |
| Officer, PATRICK MURPHY, | ) | |
| Lincoln Police Department Officer, | ) | |
| and JASON DRAGER, Lincoln | ) | |
| Police Department Officer, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff brings this 42 U.S.C. § 1983 and negligence action against the City of Lincoln, Nebraska, and several of its police officers for violations of his Fourth and Fourteenth Amendment rights when the officers allegedly falsely arrested and used excessive force in detaining and arresting him. After resolution of the Defendants' Motion to Dismiss (Filing No. 31), the remaining claims in this suit are: (1) a false-arrest claim against the Defendant police officers in their individual capacities; (2) an excessive-force claim against the Defendant police officers in their individual capacities; and (3) a negligence claim against the City of Lincoln.

In four separate motions, Defendants move for summary judgment, arguing that (1) the Defendant police officers are entitled to qualified immunity and to judgment

on the merits as to Plaintiff's false-arrest and excessive-force claims (Filing Nos. 73, 74, 75); and (2) the City of Lincoln is entitled to sovereign immunity and to judgment on the merits as to Plaintiff's negligence claim (Filing No. 72). I shall grant the motions in part and deny them in part.

## I. STATEMENTS OF MATERIAL FACTS

Unhelpfully, both Plaintiff and Defendants have presented the court with their own statements of material facts, Plaintiff has not properly controverted the Defendants' statement of facts pursuant to NECivR 56.1, and Defendants have not responded in any fashion to Plaintiff's statement of facts. While Rule 56.1(b)(1)[1] allows me to consider Defendants' statement of facts admitted under these

---

[1]Nebraska Civil Rule 56.1 requires that a party opposing a summary judgment motion must include in its responsive brief

a concise response to the moving party's statement of material facts. Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.

NECivR 56.1(b)(1) (emphasis in original). Here, Plaintiff has not followed this rule, but has attempted to controvert Defendants' statement of material facts by broadly asserting that "many of the 'facts' cited by the City are disputed and contradicted by the evidence" (Filing No. 82 at CM/ECF p. 9) and by including in its opposing briefs a "Statement of Additional Material Facts That Preclude Summary Judgment" that, as a practical matter, contradicts some of the Defendants' statement of facts.

circumstances[2], I am also bound to give due consideration to Plaintiff's properly referenced statement of facts presented in opposition to the Defendants' Motions for Summary Judgment. *Jenkins v. Winter*, 540 F.3d 742, 747 (8th Cir. 2008) (district court erred in not considering statement of facts presented in opposition to summary judgment motion). Therefore, I shall reproduce both statements of material facts verbatim and discuss any relevant disputes of fact in the course of analyzing the substance of the pending motions.

---

[2]*See Ballard v. Heineman*, 548 F.3d 1132, 1133 (8th Cir. 2008) ("We follow the district court in considering [the defendants'] statements of fact in support of their motions for summary judgment 'deemed admitted' under Nebraska Local Civil Rule 56.1(b) because [the plaintiff] did not respond to those statements of fact."); *Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1033 (8th Cir. 2007) (district did not abuse discretion in deeming admitted moving party's statements of undisputed facts where opposing party's responses violated Iowa Local Rule 56.1 because the "district court was not obliged to scour the record looking for factual disputes"); *Jones v. United Parcel Service, Inc.*, 461 F.3d 982, 991 (8th Cir. 2006) (district court did not abuse discretion in deeming admitted defendants' uncontroverted facts where plaintiff's response violated W.D. Missouri Local Rule 56.1; district court was not required to give specific notice of rule violation before disregarding the response); *Northwest Bank and Trust Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003) (district courts may adopt local rules designed to streamline resolution of summary judgment motions). *See also Blair v. Douglas Cty.*, No. 8:11CV349, 2013 WL 12123890, at *5 (D. Neb. July 19, 2013) (pursuant to Nebraska Civil Rule 56.1(b)(1), court would consider as admitted statement of facts set forth by party moving for summary judgment when opposing party did not "oppose each numbered paragraph in [the moving party's] statement of facts"); *LOL Fin. Co. v. Paul Johnson & Sons Cattle Co.*, 758 F. Supp. 2d 871, 878 (D. Neb. 2010) (deeming admitted movant's statement of material facts when opposing party failed to respond to movant's statement of facts, but instead responded "with their own 22-paragraph statement of material facts"); *Cordray v. 135-80 Travel Plaza, Inc.*, 356 F. Supp. 2d 1011, 1014-15 (D. Neb. 2005) (granting summary judgment based in part on opposing party's failure to address each numbered paragraph of moving party's statement of material facts).

The Defendants' statement of material facts is as follows[3]:

1.     Plaintiff Barine Deezia was a resident of Lincoln, Nebraska, on March 20, 2016, the date of the incident giving rise to this case.

2.     City of Lincoln is a political subdivision of the State of Nebraska that provides law enforcement through police officers employed at the Lincoln Police Department ("LPD").

3.     Defendants Gregory Graham, Aaron Peth, Trey Wayne, Andrew Winkler, Mark Moore, Patrick Murphy, and Jason Drager (collectively "Defendants") were police officers with LPD who were acting in the scope of their employment during the incident giving rise to this case.

4.     On Saturday, March 19, 2016, Nyakiam Domach ("Domach"), Barine Deezia ("Plaintiff"), Elizabeth Grayer ("Grayer") and another male were at a housewarming party.

5.     Domach and Plaintiff[] had been drinking alcohol that evening.

6.     On Sunday, March 20, 2016, at approximately 12:30 a.m. Domach, Plaintiff, Grayer, and the other male went to "Main Street Café," a bar in downtown Lincoln, Nebraska, near 14th and O Streets.

7.     On Sunday, March 20, 2016, shortly after the close of the bars in downtown Lincoln, Nebraska, at approximately 2:00 a.m. several LPD officers, including Defendants, were monitoring the area of 14th and O Streets.

---

[3]Defendants' four briefs (Filing Nos. 77-80) in support of their four Motions for Summary Judgment (Filing Nos. 72-75) appear to contain identical Statements of Material Facts. For purposes of conserving space, Defendants' citations to the pleadings and evidence have been deleted, but can be viewed in any of their four briefs (Filing Nos. 77-80).

8.    At the same time, Domach, Plaintiff, Grayer, and the other male left "Main Street Café."

9.    Nearby the other Defendants were positioned in that area as follows: Officers Graham, Peth, Winkler, and Moore, were on the southwest corner of 14th and O Streets. Officer Wayne was standing on the southeast corner of 14th and O Streets. Officers Murphy and Drager were on the northeast corner of 14th and O Streets.

10.    At that time, each Defendant was in his LPD uniform with his police badge displayed.

11.    Officers Graham, Winkler, Murphy, and Drager were wearing body cameras on March 20, 2016.

12.    Around 2:04 a.m. Officer Moore saw Domach, Plaintiff, Grayer, and the other male near the southwest corner of 14th and O Streets and commented to Officer Graham, Officer Peth, and Officer Winkler about how drunk Domach appeared.

13.    Officer Moore attempted to talk to the group, but they refused to answer and walked away.

14.    Moments later the Officers saw Ms. Domach being carried across the street northbound by Plaintiff, Ms. Grayer, and the other male. Ms. Domach appeared to be highly intoxicated and nearly unconscious.

15.    Officer Graham and Officer Peth walked across the street northbound in the crosswalk to attempt to contact the group. At the same time, Officer Winkler trailed behind both groups with Juan Ramirez ("Ramirez"), who was a civilian ride-along with Officer Winkler that evening.

16.    As the two groups walked across the street, Officer Graham attempted to talk to Plaintiff's group to ensure the wellbeing of Domach and to see if medical attention was required.

17.    Plaintiff began to act in an overagitated manner and was

confrontational. Plaintiff stated that "she is fine, she is 21, she is not driving." Officer Graham explained that the group was not in trouble and that the Officers simply wanted to make sure the Domach was okay, whether she knew the individuals carrying her, if medical attention was required, and what establishment they were coming from.

18.     Once they reached the northwest corner, Officer Graham asked the group to sit Ms. Domach in a patio chair in the Jimmy John's outdoor patio area. At that point, Officer Graham attempted to talk to Grayer who appeared to be the calmest and most cooperative.

19.     As this was going on, Officer Winkler and Ramirez stood back approximately 15-20 feet away, but within eyesight.

20.     As Officer Graham attempted to talk to Ms. Grayer, Plaintiff became verbally aggressive and got in Officer Graham's face and began screaming "do not talk to her" and then yelled at Grayer telling her "you will not talk to them" and "do not talk to them."

21.     Officer Graham asked Plaintiff several times to be quiet and to step away. Graham also asked Plaintiff to calm down, that they would not be in any trouble if he could simply determine if Domach was safe, knew the group, and where they were coming from.

22.     The Officers told Deezia that they did not want to talk to him.

23.     While Plaintiff continued to be belligerent towards Officer Graham, Domach remained unresponsive.

24.     Because Plaintiff was making it impossible for Officer Graham to get any information from Grayer, Officer Peth attempted to redirect Plaintiff by asking Plaintiff to step away from the group.

25.     Officer Peth placed his hand on Plaintiff's torso to guide him towards the building to separate him from the group.

26.     Plaintiff was immediately resistive to this and refused to

walk with Officer Peth by planting his feet and then pushing Officer Peth in the chest.

27.     After being pushed, Officer Peth grabbed Plaintiff's hand and told him to put his hands behind his back. Plaintiff ignored this order.

28.     Officer Winkler then approached Plaintiff and Officer Peth. He told Plaintiff to put his hands behind his back as he grabbed one of Plaintiff's hands. Plaintiff did not put his hands behind his back and resisted Officer Peth's and Officer Winkler's attempts to force them behind his back.

29.     While Officer Peth and Officer Winkler were doing this, Officer Graham stayed next to Grayer, Domach and the other male to ensure everyone's safety and make sure no other individuals interfered with Officer Peth or Officer Winkler.

30.     Plaintiff continued to pull and push away from Officer Peth and Officer Winkler, so Officer Peth and Officer Winkler attempted to place Plaintiff on the ground in an effort to gain better control.

31.     Once Plaintiff was on the ground, he continued to struggle and was able to stand back up.

32.     During this time, Officer Moore, who was still over on the southwest corner, heard his name being called. When he turned around, he saw Plaintiff fighting with Officer Peth and Officer Winkler. Officer Moore then ran across the street and began assisting Officer Graham with crowd control.

33.     Officer Peth and Officer Winkler then attempted to back Plaintiff up into the window of Jimmy John's to gain better control of Plaintiff. At the same time, Officer Peth and Officer Winkler told Plaintiff to stop resisting and put his hands behind his back. Plaintiff ignored these commands and continued to pull away from the Officers and actively resisted efforts to be handcuffed.

34.     Officer Winkler then attempted to strike Plaintiff's right leg with a closed fist to distract Plaintiff and get him to comply; however, this attempt was unsuccessful and Plaintiff became even more aggressive with Officer Peth and Officer Winkler.

35.     Officer Peth then performed a balance displacement technique to place Plaintiff on the ground a second time.

36.     Once on the ground, Plaintiff continued to resist and struggle with Officer Peth and Officer Winkler and was able to return to his feet.

37.     Plaintiff actively tried to get away from the Officers and pulled his arms away.

38.     At this time, from his position across the street, Officer Wayne saw Officer Peth and Officer Winkler physically struggling with Plaintiff and ran across the street to assist.

39.     As Officer Wayne approached the scene, Officer Peth performed a knee strike to Plaintiff's left common peroneal with no effect.

40.     Seeing that the knee strike had no effect, Officer Wayne then announced his presence and ordered Plaintiff to "stop fighting." Wayne repeated a second time "Police stop fighting." When those orders were ignored and Plaintiff continued to pull away and fight with the Officers, Officer Wayne grabbed Plaintiff's left wrist and arm above the elbow.

41.     At that time, Officer Wayne, who was at the eastern most outside edge of the patio, pulled out his Taser and ordered that Plaintiff stop or be tased.

42.     Realizing that the Taser would not work in such close quarters, Officer Wayne put away the Taser. As this happened, Officer Murphy and Officer Drager saw what was going on and ran across the street to help.

43.     As Officer Drager and Officer Murphy reach[ed] the patio area, Plaintiff moved towards the outside of the patio towards Officer Wayne and the approaching officers. Upon reaching the patio, Plaintiff moved to the east edge of the patio near Officer Murphy, so Officer Murphy reached for Plaintiff's arm, but was unable to grab ahold of it.

44.     Plaintiff continued to move towards the patio's exit, towards Officer Drager, so Officer Drager grabbed Plaintiff's head to pull him forward towards the ground, but Plaintiff pushed and pulled away from Officer Drager.

45.     Breaking through to outside the gated patio, Plaintiff went towards Officer Wayne and wrapped him up around his waist. Faced with the option of either falling backwards on his back and being in an extremely dangerous position, or counter Plaintiff's forward momentum, Officer Wayne took advantage of Plaintiff's forward moment[um] and performed an inside takedown to displace Plaintiff and get him to the ground.

46.     Plaintiff landed on the sidewalk hitting his head as he landed. As Officer Winkler and Officer Murphy applied handcuffs, they realized Plaintiff was unconscious due to hitting his head when he landed. Officer Wayne and Officer Graham immediately called for medical personnel while Officer Murphy and Officer Wayne moved Plaintiff to his side in the recovery position.

47.     Medical personnel were dispatched to the scene at 2:05 a.m.

48.     Medical personnel arrived and Plaintiff was ultimately transported to Bryan West Medical Center by Lincoln Fire and Rescue.

49.     Upon arrival at [the] hospital, Plaintiff continued to be very combative, screaming and yelling.

50.     While at the hospital Plaintiff was uncooperative and noncompliant with the nurse and initially refused treatment. Medical personnel did not allow Plaintiff to refuse treatment unless he tested .000

for breath alcohol content. Plaintiff attempted to calculate the amount of time since his last drink to decide if he was going to allow testing of his alcohol level and ultimately refused the test. After doing this and repeated ongoing discussions with the medical providers, Plaintiff eventually relented and allowed hospital personnel to evaluate and treat him.

51.     While at the hospital, Plaintiff told Officer Murphy and medical personnel that he was at home when he got a telephone call from a friend who was having issues with his girlfriend and needed help with a ride from Main Street. Plaintiff explained he was only at Main Street for a few minutes and did not drink there. He also initially denied drinking at all that evening.

52.     Plaintiff was ultimately treated at the hospital for a fractured left scapula and discharged from the hospital at approximately 5:30 a.m.

53.     From the hospital, Officer Wayne and Officer Peth then transported Plaintiff to the Lancaster County Department of Corrections.

54.     While being booked into jail, Plaintiff was given a preliminary breath test which showed that Plaintiff had a breath alcohol content of 0.114.

(Filing Nos. 77-80, Defs.' Briefs Supp. Motions Summ J. (Statements of Material Facts) (citations to pleadings and evidence omitted).)

Plaintiff's "Statement of Additional Material Facts"[4] is as follows:

1.     In the evening of Saturday, March 19, 2016, Plaintiff Barine Deezia ("Mr. Deezia") was at a housewarming party for two of his friends, Nyakiam Domach ("Ms. Domach") and Meelubari Maaloo ("Mr.

_____

[4]Plaintiff's four briefs (Filing Nos. 82-85) in opposition to Defendants' four Motions for Summary Judgment (Filing Nos. 72-75) appear to contain identical Statements of Additional Material Facts.

Maaloo"), with another friend, Elizabeth Grayer ("Ms. Grayer").

2.     Shortly after midnight, Ms. Domach, Mr. Maaloo, Ms. Grayer and Mr. Deezia went to Main Street Bar ("Main Street") on O Street, Lincoln, Nebraska where they stayed until a few minutes before 2:00 a.m.

3.     While at Main Street, none of the individuals in Mr. Deezia's party drank any alcohol as they had gone to the bar to enjoy the music.

4.     As soon as the four individuals exited Main Street, they were confronted by Lincoln Police Officers who asked Ms. Grayer and Mr. Deezia if Ms. Domach was okay, to which they replied that she was.

5.     As the group walked down O Street toward North 14th Street, another Lincoln Police Officer apparently thought Ms. Domach appeared drunk and asked the group which bar made Ms. Domach so drunk, to which the group responded that Ms. Domach did not have any alcohol at a bar and that the group was going home.

6.     At the intersection of O Street and North 14th Street, the group of friends stopped to wait for a cross-walk signal to cross the street to the north.

7.     By the time the group reached the intersection, there were four Lincoln Police Officers following them, including one of the officers that had questioned them outside Main Street.

8.     While they were waiting for the cross-walk signal at O Street and North 14th Street, an officer again asked if Ms. Domach was okay. For a third time, the group explained that Ms. Domach was okay and that they were going home. They also explained that Ms. Grayer was the designated driver.

9.     Mr. Maaloo and Ms. Grayer helped Ms. Domach cross O Street and the officers followed.

10.    In the middle of the intersection, the officers again asked at what bar the group had been.

11.    Again, individuals in the group explained that Ms. Domach was fine and that they were going home.

12.    After they crossed O Street, they helped Ms. Domach sit down in a chair in the outside dining area of Jimmy John's Restaurant.

13.    None of the officers told the group to sit Ms. Domach down.

14.    At the time when Ms. Domach sat down outside Jimmy John's, the group was under no obligation to speak to the officers.

15.    The outside dining area of Jimmy John's has a metal fence around it with a small opening opposite the restaurant's front entrance.

16.    Mr. Maaloo, Ms. Domach, Ms. Grayer and Mr. Deezia were all inside the enclosed area.

17.    Defendants Officer Gregory Graham and Officer Aaron Peth stopped to talk to the group again.

18.    Officer Graham stood in the opening of the metal fence. At the criminal trial, Officer Peth testified that at least two officers blocked the entryway of the outside patio and that Mr. Deezia would have to walk through the officers to leave. Officer Peth never told Mr. Deezia that he was free to leave.

19.    Officer Graham continued to ask the same questions to which Mr. Deezia replied, "She's fine. We are going home."

20.    Officer Graham said he did not want to talk to Mr. Deezia and that he wanted to talk to Ms. Grayer so Mr. Deezia stopped talking and took a step back to let the officers talk to Ms. Grayer.

21.    Officer Graham asked Ms. Grayer the same questions to which Ms. Grayer responded, "We are going home. We are taking her

home. I am the designated driver."

22.     During this conversation, Mr. Deezia did not interrupt Ms. Grayer, move toward either officer, nor push or touch either officer.

23.     Officer Graham again asked Ms. Grayer the same questions that had been answered many times since the friends left Main Street.

24.     Officer Graham admitted at the criminal trial that the officers had been informed multiple times that Ms. Domach was okay.

25.     After Officer Graham asked the same questions, Ms. Grayer looked over at Mr. Deezia and Mr. Deezia told her, "You don't have to answer the question if you don't want to."

26.     Officer Peth responded, "What did you say?" Mr. Deezia repeated, "She doesn't have to answer if she doesn't want to."

27.     Officer Peth grabbed Mr. Deezia's arm and repeated, "What did you say?"

28.     Mr. Deezia told Officer Peth not to touch him and tried to move back, but Officer Peth began to push Mr. Deezia.

29.     Before Officer Peth initiated physical contact, Mr. Deezia was not physically aggressive, did not try to punch Officer Peth, and did not make any direct threats toward Officer Peth.

30.     Mr. Deezia was never physically aggressive with Officer Graham.

31.     Officer Peth, Officer Andrew Winkler and one other officer shoved Mr. Deezia against the front window of Jimmy John's, causing him to lose his balance and stumble.

32.     As Mr. Deezia tried to regain his balance, Officer Trey Wayne used a maneuver called an "inside takedown", which caused Mr. Deezia to be thrown to the ground and strike his head on the sidewalk.

33.    When performing the inside takedown, Officer Wayne's body weight of 250 pounds fell on top of Mr. Deezia's head.

34.    When using an inside takedown, an officer is supposed to go on his knees and not fall full weight on the other individual.

35.    Mr. Deezia lost consciousness when his head struck the sidewalk. When he regained consciousness, he was laying face down with an officer's knee in his back.

36.    Officer Wayne did not know Mr. Deezia had lost consciousness until after Mr. Deezia was already in handcuffs.

37.    From the time he was thrown against the restaurant's window, Mr. Deezia was repeatedly struck by the officers' fists, elbows, and knees, which continued after Mr. Deezia had already been handcuffed.

38.    During the entire incident, none of the individual defendants told Mr. Deezia that he was under arrest.

39.    During the entire incident, Mr. Deezia did not hear any officer say, "Put your hands behind your back."

40.    During the entire incident, Mr. Deezia did not hear any officer say "stop fighting" or "stop resisting".

41.    Along with the loss of consciousness, Mr. Deezia suffered a fracture of the coracoid[] process of his left shoulder, cuts, bruises, scrapes, and contusions as a result of being thrown against the window, thrown against the sidewalk, and struck by the officers' hands, elbows, and knees.

42.    Mr. Deezia was arrested and charged with resisting arrest and obstructing a peace officer.

43.    On November 10, 2016, after a three day trial, a jury

returned a unanimous verdict of "not guilty" to these charges within an hour.

(Filing Nos. 82-85, Pl.'s Briefs Opp'n Motions Summ. J. (Statements of Additional Material Facts) (citations to pleadings and evidence omitted).)

## II. STANDARD OF REVIEW

The Defendant police officers claim they are entitled to qualified immunity and to judgment on the merits on Plaintiff's false-arrest and excessive-force claims. In yet another factual wrinkle, "[w]hen qualified immunity is raised at the summary judgment stage, the proper course is to view the facts and draw reasonable inferences in the light most favorable to the plaintiff—which 'usually means *adopting . . . the plaintiff's version of the facts*'—and then to assess the constitutionality of the challenged conduct." *Shannon v. Koehler*, 616 F.3d 855, 864 n.5 (8th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 377-78 (2007)) (emphasis added).

"Determining the question of qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Santiago v. Blair*, 707 F.3d 984, 989 (8th Cir. 2013). Courts may address either prong of the analysis first, *Pearson v. Callahan,* 555 U.S. 223, 236 (2009), and "the defendants are entitled to qualified immunity unless the answer to both of these questions is yes." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012).

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority. It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the

particular rule the plaintiff seeks to apply.

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations omitted).

Especially in the Fourth Amendment context, "[t]he clearly established standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him" and "[t]he rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotations and citation omitted); *see also White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) ("clearly established law should not be defined at a high level of generality. . . . [and] must be particularized to the facts of the case"; "While this Court's case law do[es] not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.") (internal quotation marks and citations omitted); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (specificity in defining clearly established law for qualified immunity purposes "is especially important in the Fourth Amendment context, where the Court has recognized that [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts") (internal quotation marks and citations omitted).

## III. DISCUSSION

Plaintiff argues that what started as a consensual encounter—the officers' questioning Plaintiff's group as they crossed the street regarding Ms. Domach's welfare and what bar was responsible for over-serving her—turned into an investigatory detention without reasonable articulable suspicion in violation of the Fourth Amendment when Plaintiff's group entered the fenced outdoor dining area of

Jimmy John's and Officers Graham and Peth blocked the entrance to the dining area such that the group could not leave.

In further violation of Plaintiff's Fourth Amendment rights—and these are the only claims asserted in Plaintiff's Amended Complaint (Filing No. 26)—Plaintiff claims that Defendants arrested him without probable cause and used excessive force in doing so. (Filing No. 85 at CM/ECF pp. 13-14.) Finally, Plaintiff asserts that the City of Lincoln negligently trained, screened, hired, and supervised its police officers.

## A. False Arrest

### 1. Events Preceding Arrest

Chronologically dissecting the March 2016 event, it is clear that the officers were lawfully permitted to ask Plaintiff's group questions as they crossed the street after exiting the bar. *Fla. v. Bostick*, 501 U.S. 429, 434-435 (1991) ("a seizure does not occur simply because a police officer approaches an individual and asks a few questions"; "when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual . . . as long as the police do not convey a message that compliance with their requests is required"). Further, when Plaintiff and his friends voluntarily seated themselves in the Jimmy John's dining area, Plaintiff had the right to refuse to answer the officers' repeated questions and to advise his friend, Elizabeth Grayer, that she need not continue to answer the officers' repetitive inquires. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. And any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.") (internal quotation marks and citations omitted).

However, when Officer Graham positioned himself to block the only opening to and from the fenced dining area, he "communicated to [Plaintiff and his friends that they were] not free to decline the officers' requests or otherwise terminate the encounter," *Bostick*, 501 U.S. at 439, thereby "seizing" Plaintiff within the meaning of the Fourth Amendment. "Seizures" include both investigative stops and arrests, but an investigative stop must be supported by individualized, reasonable, articulable suspicion that the person detained is committing or is about to commit a crime, whereas an arrest must be supported by probable cause. *United States v. Bearden*, 780 F.3d 887, 894 (8th Cir. 2015); *United States v. Bloomfield*, 40 F.3d 910, 916 (8th Cir. 1994).

As evidenced by the officers' repeated questions to Plaintiff and his friends concerning the bar that might have been responsible for Domach's suspected drunken condition, the officers had no individualized suspicion that Plaintiff himself was committing, or about to commit, a crime. *Navarette v. California*, 572 U.S. 393, 396-97 (2014) ("The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting *the particular person* stopped of criminal activity.") (internal quotation marks and citations omitted; emphasis added); *Arizona v. Johnson*, 555 U.S. 323, 326 (2009) (police officer in an "on-the-street" encounter may execute an investigatory stop when "the police officer reasonably suspects that *the person apprehended* is committing or has committed a criminal offense") (emphasis added); *United States v. Cortez*, 449 U.S. 411, 417-18 (1981) ("the detaining officers must have a particularized and objective basis for suspecting *the particular person* stopped of criminal activity") (emphasis added); *Buffkins v. City of Omaha, Douglas Cty., Neb.*, 922 F.2d 465, 470 (8th Cir. 1990) ("In order to constitute a reasonable articulable suspicion the known facts must reasonably relate to *the person about to be stopped* and demonstrate a reasonable suspicion that *the person* has engaged or will engage in criminal activity.") (emphasis added).

Even if the officers' investigative detention of Plaintiff had been justified, "[i]f the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way." *Wardlow*, 528 U.S. at 125. Construing the evidence in favor of Plaintiff, after Plaintiff and his friends were seated in the Jimmy John's patio area, the officers continued asking the same questions they had asked at least four times previously, receiving the same responses they had already gotten—that is, Plaintiff and his friends had just exited the Main Street Café, Domach was fine, and the group was heading home with the assistance of a designated driver. At that point, the officers learned nothing establishing probable cause to arrest Plaintiff.

Nevertheless, instead of allowing Plaintiff and his friends to go on their way, Officer Peth grabbed Plaintiff's arm after Plaintiff advised Ms. Grayer that she need not continue answering the officer's questions. Plaintiff then told Officer Peth to stop touching him, tried to move back, and tried to get away from the officers, but Officer Peth, and possibly other officers, pushed Plaintiff against the front window of Jimmy John's, causing him to lose his balance and stumble.

## 2. The Arrest

At this point, the Defendants admit that Plaintiff's investigative detention transformed into an arrest[5], which is obviously the basis for Plaintiff's false-arrest claim.[6] *See United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012) ("where an

---

[5]Filing No. 79, Defs.' Br. Supp. Summ. J. at CM/ECF pp. 17-19 (asserting that Plaintiff pushed Officer Peth, and when he did so, encounter "admittedly amount[ed] to an arrest under the Fourth Amendment").

[6]Even if the officers lacked reasonable articulable suspicion to detain Plaintiff initially, as discussed above, Plaintiff's response to "even an invalid . . . *Terry* stop may constitute independent grounds for arrest" and therefore serve as a basis for Plaintiff's claim. *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995); *United*

officer exceeds the permissible scope of *Terry*, the investigatory detention is transformed into an arrest"); *United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir. 2007) ("An investigative detention may turn into an arrest . . . if officers use unreasonable force.") (internal quotation marks and citation omitted); *Bloomfield*, 40 F.3d at 916-17 ("Although there is no bright line of demarcation between investigative stops and arrests, a de facto arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop.") (internal quotation marks and citations omitted).

Plaintiff claims Defendants lacked probable cause to arrest him, in violation of the Fourth Amendment, and Defendants assert that they have qualified immunity from such a claim. *See Parsons v. McCann*, 138 F. Supp. 3d 1086, 1106 (D. Neb. 2015) (a false arrest is a violation of the Fourth Amendment right against the unreasonable seizure of persons). "[A] false arrest claim under § 1983 fails as a matter of law where the officer had probable cause to make the arrest." *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 758 (8th Cir. 2001). At the time of the incident at issue, "[i]t was clearly established . . . that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment," *Hoyland v. McMenomy*, 869 F.3d 644, 652 (8th Cir. 2017) (describing state of the law in 2013) (internal quotation marks and citations omitted), and that an officer has probable cause to make a warrantless arrest only when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense. *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011) (internal quotation marks and citation omitted).[7]

---

States v. Blackmon*, 662 F.3d 981, 985 (8th Cir. 2011) (same).

[7]As was the case here, "[t]he fact that the person arrested is later found innocent is not material." *Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013).

For qualified immunity purposes, the issue "is not probable cause in fact[,] but arguable probable cause." *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000) (internal quotation marks and citation omitted). "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." *Borgman*, 646 F.3d at 523; *see also Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005) ("Because the qualified immunity privilege extends to a police officer who is wrong, so long as he is reasonable, the governing standard for a Fourth Amendment unlawful arrest claim is not probable cause in fact but arguable probable cause . . . that is, whether the officer should have known that the arrest violated plaintiff's clearly established right.") (internal quotation marks and citations omitted). "Under this objective legal reasonableness standard, courts may not delve into the officers' subjective motivation for their actions." *Joseph*, 712 F.3d at 1226 (internal quotation marks and citation omitted).

First, Plaintiff has presented no evidence to suggest that Defendant Officers Murphy and Drager were involved in arresting him. Specifically, Plaintiff has not refuted Officer Murphy's and Drager's affidavits stating that they were standing on the northeast corner of 14th and O Streets when they observed Officers Winkler, Peth, and Wayne struggling with Plaintiff on the northwest corner of the intersection. (Filing No. 76-7, Aff. Murphy ¶¶ 2-3; Filing No. 76-8, Aff. Drager ¶¶ 2-3.) Without personal involvement in the alleged constitutional violation, these officers cannot be liable on Plaintiff's false-arrest claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.")[8]

_____

[8]It may be that other of the Defendant officers were not personally involved in Plaintiff's arrest, but it is unclear at this point due to Plaintiff's testimony that he does not recall what each of the Defendant police officers did during the events of March 20, 2016, (Filing No. 76-17, Dep. of Deezia at 109:22-111:6) and the lack of clarity

Second, as to the remaining Defendants, it is undisputed that Plaintiff was arrested for obstructing a peace officer under Neb. Rev. Stat. § 28-906(1)(a) and resisting arrest under Neb. Rev. Stat. § 28-904(1), both of which are misdemeanors.[9] In Nebraska, "[a] person commits the offense of obstructing a peace officer, when, by using or threatening to use violence, force, physical interference, or obstacle, he or she intentionally obstructs, impairs, or hinders . . . the enforcement of the penal law or the preservation of the peace by a peace officer . . ." Neb. Rev. Stat. § 28-906(1) (Westlaw 2018). "There must be some sort of affirmative physical act, or threat thereof, for a violation of [Neb. Rev. Stat. § 28-906(1)(a)] to occur," *State v. Ellingson*, 703 N.W.2d 273, 282 (Neb. App. 2005), including "[t]he mere act of running away from law enforcement officers," which alone "constitutes physical interference or obstacle within the meaning of this provision." *United States v. Sledge*, 460 F.3d 963, 967 (8th Cir. 2006).

The other misdemeanor for which Plaintiff was arrested, resisting arrest, is an offense which occurs when "he or she uses or threatens physical force or violence against a peace officer while intentionally preventing or attempting to prevent the peace officer from effecting an arrest of the actor or another." *State v. Heath*, 838 N.W.2d 4, 17 (Neb. App. 2013). Verbal advisement of an attempted arrest is not required; it is enough that the officer has begun to take actions to effectuate physical control over the defendant. *Id.*

On these facts, construed in Plaintiff's favor, a reasonable officer would not

---

of Plaintiff's statement of material facts regarding which officers were responsible for Plaintiff's arrest (Plaintiff's Statement of Fact No. 31 ("Officer Peth, Officer Andrew Winkler and one other officer shoved Mr. Deezia")). However, with regard to Officers Murphy and Drager, Defendants have filed evidence of their lack of involvement at the arrest stage, and Plaintiff has failed to refute that evidence.

[9]Resisting arrest under Neb. Rev. Stat. § 28-904 is a misdemeanor if it is a first offense, as was the case here. (Filing No. 81-2, Criminal Trial Tr. at 14:16-19.)

have believed they had arguable probable cause to arrest Plaintiff for either of these misdemeanors or for any other crime. Elizabeth Grayer—the designated driver—repeatedly testified that Plaintiff never physically inserted himself between her and the officers who were questioning her. (Filing No. 81-2, Criminal Trial Test. of Grayer at 581:10-12, 586:11-13, 606:23-24.) She testified that Plaintiff did not yell at, threaten, push, or punch any of the officers before Plaintiff was pushed into the Jimmy John's window and before multiple officers "body slammed [him] to the ground." (*Id*. at 582:11-20, 586:14-16, 606:10-22, 609:4-24, 623:7-9; *see also* Filing No. 81-2, Criminal Trial Test. of Maaloo at 536:17-19, 538:11-12, 542:5-7; Filing No. 81-2, Criminal Trial Test. of Hoefer at 396:23-24 ("I can't honestly say I saw him physically do anything to the officers.").) Even Officer Peth testified that before he made physical contact with Plaintiff, he was not physically aggressive, did not try to punch him, and did not make any threats. (Filing No. 81-2, Criminal Trial Test. of Peth at 89:17-90:4.) Officer Peth also stated that the situation did not escalate until he made physical contact with Plaintiff. (*Id*. at 90:2-4.) Officer Graham concurred that, prior to Officer Peth making physical contact, Plaintiff did not make any threats and had not thrown any punches at the officers. (Filing No. 81-2, Criminal Trial Test. of Graham at 152:22-25.)

All Plaintiff had done at the time officers shoved him into the Jimmy John's window, and therefore arrested him, was instruct Grayer to refuse to provide information already conveyed to the officers four times previously. "[T]he mere verbal refusal to provide information to an officer does not constitute an obstacle to the enforcement of the penal laws as contemplated by § 28-906." *State v. Yeutter*, 566 N.W.2d 387, 391 (Neb. 1997).

Under these factual circumstances—that is, where Plaintiff did not use, or threaten to use, violence, force, physical interference, or other type of obstacle against the officers in their attempt to confirm the safety of Ms. Domach (not Plaintiff) and investigate a possible tavern violation (also not involving Plaintiff), and where

Plaintiff had not committed a violation of penal law that officers were attempting to enforce against him—it was not objectively reasonable for a police officer to believe that he had probable cause to arrest Plaintiff for obstructing a peace officer under Neb. Rev. Stat. § 28-906(1), for resisting arrest under Neb. Rev. Stat. § 28-904(1), or for any other crime.

Accordingly, Defendant Murphy and Drager's Motion for Summary Judgment (Filing No. 75) will be granted as to Plaintiff's false-arrest claim for lack of personal involvement in the constitutional violation. Because the remaining Defendant officers are not entitled to qualified immunity on Plaintiff's false-arrest claim, and their Motions for Summary Judgment shall be denied in this respect.

## B. Excessive Force

The Fourth Amendment's right to freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). "[T]he right to be free from excessive force in the context of an arrest has been clearly established for some time." *Wilson v. Spain*, 209 F.3d 713, 716 n.3 (8th Cir. 2000).

To show a Fourth Amendment violation by the use of force, a plaintiff must establish (1) that he was "seized" within the meaning of the Fourth Amendment and (2) that an officer's use of force was objectively unreasonable given the facts and circumstances of the incident as "judged from the perspective of a reasonable officer on the scene," *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir. 2013) (internal quotation and citation omitted), and "without regard to their underlying intent or motivation." *Ellison v. Lecher*, 796 F.3d 910, 916 (8th Cir. 2015) (internal quotation marks and citation omitted).

As discussed above, Defendants concede that Plaintiff was arrested, and

therefore seized, at the point when officers pushed Plaintiff against the front window of Jimmy John's. *See Sledge*, 460 F.3d at 967 (the officers' "grabbing" Plaintiff "constituted an actual seizure of [his] person, or, in other words, an arrest"); *see also Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1208 (8th Cir. 2013) (to constitute a Fourth Amendment "seizure," there must be willful or intentional application of physical force, as determined by the "officer's objective behavior," or plaintiff's submission to the police officer's show of authority).

As to the objective reasonableness of the officers' use of force against Plaintiff, relevant factors include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "[I]t is clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009).

Construing the facts in favor of Plaintiff, here we have a man who was tired of answering the same questions he and his friends had been asked at least four times by Lincoln police officers after exiting a downtown bar regarding the level of intoxication of one of Plaintiff's friends; who told one of his friends she need not continue answering such questions; who told Officer Peth not to touch him as Peth tried to physically guide Plaintiff away from his friends during continued questioning; and who did not yell at, threaten, push, or punch any of the officers. In response, Officer Peth, Officer Winkler, and one other officer shoved Plaintiff against the front window of Jimmy John's, causing him to lose his balance and stumble. He was then

repeatedly struck by officers' fists, elbows, and knees, and 250-pound Officer Wayne ultimately slammed Plaintiff's head into the sidewalk while attempting to perform an "inside takedown" maneuver, causing Plaintiff to lose consciousness and suffer a fracture of the coracoid process of his left shoulder, cuts, bruises, scrapes, and contusions. When Plaintiff regained consciousness, he was lying face-down in a pool of blood with an officer's knee in his back.

The offenses with which Plaintiff was charged as a result of this incident are Class I misdemeanors under Nebraska law. Neither the Plaintiff nor his friends appeared to be armed, dangerous, or a threat to the security of the officers or the public. And while Plaintiff admits that he tried to "get away" from the officers, Officer Wayne himself confirmed that Plaintiff was "not running" from the scene. (Filing No. 81-3, Dep. Wayne at 86:16-24.)

Plaintiff has presented sufficient proof in support of his claim, if believed, to allow a reasonable jury to find that after "seizing" Plaintiff within the meaning of the Fourth Amendment, the officers used a degree of force in arresting him for two misdemeanors that was not "objectively reasonable." For qualified immunity purposes, the question then becomes whether the law at the time of the incident clearly established that the level of force used in this context constituted excessive force. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1012 (8th Cir. 2017).

In March of 2016, "several cases establish[ed] that every reasonable officer would have understood that he could not forcefully take down . . . a nonviolent, nonthreatening misdemeanant who was not actively resisting arrest or attempting to flee . . . in the allegedly violent and uncontrolled manner that [the Defendant officers] did." *Karels v. Storz*, No. 17-2527, __ F.3d __, 2018 WL 4957704, at *5 (8th Cir. Oct. 15, 2018) (officer not entitled to qualified immunity on excessive force claim when officer grabbed arrestee's wrist, twisted her arm, and applied handcuffs in such a manner than arrestee fractured humerus bone and required emergency surgery) (citing

*Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013); *Montoya v. City of Flandreau*, 669 F.3d 867, 873 (8th Cir. 2012); *Shannon v. Koehler*, 616 F.3d 855, 864-65 (8th Cir. 2010); *Michael v. Trevena*, 899 F.3d 528, 533 (8th Cir. 2018); *Rokusek v. Jansen*, 899 F.3d 544, 548 (8th Cir. 2018); *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1213 (8th Cir. 2013); *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009); *Rohrbough v. Hall*, 586 F.3d 582, 586-87 (8th Cir. 2009), and recognizing that although such cases "present different facts and circumstances, there is no requirement that [the plaintiff] must find a case where the very action in question has previously been held unlawful, so long as existing precedent [has] placed the statutory or constitutional question beyond debate" (internal quotation marks and citations omitted)).

Whether a reasonable officer would have interpreted Plaintiff's actions as "active resistance" or an "attempt to flee" is a disputed question of fact that a jury must decide. *Karels*, 2018 WL 4957704, at *5. Accordingly, the Defendants[10] are not entitled to qualified immunity on Plaintiff's excessive-force claim, and Defendants' Motion for Summary Judgment on such claim against Defendants in their individual capacities will be denied.

## C. Negligence

---

[10]Plaintiff's evidence establishes that Officers Peth, Winkler, and one other officer pushed him into the restaurant window and that Officer Wayne performed the inside takedown that propelled his head into the concrete. However, and as might be expected, Plaintiff's testimony is unclear as to which particular officers kneed him in the back as he was regaining consciousness and which officers repetitively struck him with their fists, elbows, and knees after they handcuffed them. While it is obvious that each Defendant may only be liable under § 1983 for their "own individual actions," *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), it is unclear at this point what actions every named officer took in applying force to Plaintiff. Accordingly, I am unable to grant any of the Defendants' Motions for Summary Judgment for lack of personal participation in the use of force against Plaintiff.

Finally, Plaintiff alleges that the City of Lincoln was negligent in the following ways:

> (a)  Failing to implement policies, customs, and practices to prevent excessive use of force by Lincoln Police Officers in general, and specifically those officers assigned to downtown bar closing at 2:00 a.m. and prior thereto;

> (b) Failing to properly screen applicants applying for jobs with the Lincoln Police Department for service in the alcohol unit patrolling downtown Lincoln's bar district on "O" Street from dusk to the 2:00 a.m. closings;

> (c) Failing to properly train Lincoln Police Officers, and in particular those officers assigned to patrol the bar district where large crowds emerge at 2:00 a.m. after consuming alcohol; and

> (d) Failing to properly supervise Lincoln Police Officers in the performance of their duties.

(Filing No. 26, Amended Complaint ¶ 84.)

The Nebraska Political Subdivisions Tort Claims Act ("NPSTCA") authorizes tort claims against municipalities, Neb. Rev. Stat. § 13-908 (Westlaw 2018), subject to certain exceptions, including "[a]ny claim arising out of assault, battery, false arrest . . . ," sometimes referred to as the intentional-torts exception. Neb. Rev. Stat. § 13-910(7) (Westlaw 2018). "Statutes that purport to waive the protection of sovereign immunity of the State or its subdivisions are strictly construed in favor of the sovereign and against its waiver. A waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication from the text as will allow no other reasonable construction." *Britton v. City of Crawford*, 803 N.W.2d 508, 514-15 (Neb. 2011).

The Nebraska Supreme Court has repeatedly found that a plaintiff cannot avoid

the intentional-torts exception by "'framing [his] complaint in terms of negligent failure to prevent the assault and battery.'" *Britton*, 803 N.W.2d at 517 (quoting *United States v. Shearer*, 473 U.S. 52 (1985)). The exception "'does not merely bar claims *for* assault or battery; in sweeping language it excludes any claim *arising out of* assault or battery. We read this provision to cover claims like [the plaintiff's] that sound in negligence but stem from a battery committed by a Government employee.'" *Id*. at 517 (emphasis in original) (quoting *Shearer*, 473 U.S. 52).

"Battery" under Nebraska law is "an actual infliction of an unconsented injury upon or unconsented contact with another" or "any intentional, unlawful physical violence or contact inflicted on a human being without his consent." *Britton*, 803 N.W.2d at 515 (internal quotation marks and citations omitted). "A harmful contact intentionally done is the essence of battery." *Id*.

Here, although Plaintiff alleges that the City of Lincoln negligently trained, screened, hired, and supervised its police officers, the injuries for which Plaintiff sues "arose out of" the officers' intentional, physical contact with Plaintiff without his consent. This constitutes "arising out of . . . battery" within the meaning of Neb. Rev. Stat. § 13-910(7). Although Plaintiff's claims are "grounded in negligence, . . . the alleged negligence was inextricably linked to a battery, and . . . this suit is thus barred by the Nebraska Political Subdivisions Tort Claims Act." *Westcott v. City of Omaha*, 901 F.2d 1486, 1490 (8th Cir. 1990) (in action against city for death of decedent, who was shot by police officer, district court correctly dismissed action when facts alleged—although cast as a negligence claim—amounted to battery under Nebraska law, and NPSTCA allows municipalities to "plead the defense of sovereign immunity to avoid any state-law claims arising out of an assault or battery"); *see also Policky v. City of Seward, Neb.*, 433 F. Supp. 2d 1013, 1027 (D. Neb. 2006) (city was immune from suit under NPSTCA when complaint alleged city was negligent in failing to properly train officer as to "the proper procedures when using a taser gun, restraining Plaintiff with unreasonable force, and . . . how to determine what facts and

circumstances merit the use of force" because city's alleged negligent failure to train was directly related to officer's employment as police officer and to his alleged intentional torts of unlawfully arresting and assaulting plaintiff); *Johnson v. State*, 700 N.W.2d 620 (Neb. 2005) (intentional torts exception in State Tort Claims Act—which was identical to the NPSTCA exception in Neb. Rev. Stat. § 13-910(7)—encompassed negligence claim asserted against state for failure to supervise, hire, and discipline because such claim arose out of assault and battery by state correctional employee, and plaintiff simply reframed the claim); *Hawkins v. Gage Cty.*, No. 4:13CV3009, 2013 WL 12073803, at *19 (D. Neb. Sept. 3, 2013), *aff'd*, 759 F.3d 951 (8th Cir. 2014) ("The creative use of negligence pleading cannot resurrect a claim that is otherwise barred by the intentional tort exception of the Nebraska Political Subdivisions Tort Claims Act.").

Because Plaintiff's negligence claim against the City of Lincoln is barred by § 13-910(7) of the Nebraska Political Subdivisions Tort Claims Act, the City of Lincoln's Motion for Summary Judgment will be granted.

## IV. CONCLUSION

For the reasons discussed above, the Motion for Summary Judgment filed by Defendant Officers Murphy and Drager as to Plaintiff's false-arrest claim will be granted for lack of personal involvement in the constitutional violation at the arrest stage; the Motions for Summary Judgment filed by Defendants Graham, Peth, Wayne, Winkler, and Moore on Plaintiff's false-arrest claim will be denied because such Defendants are not entitled to qualified immunity on that claim; and all of the individual Defendants' Motions for Summary Judgment on Plaintiff's excessive-force claim will be denied because the Defendants are not entitled to qualified immunity on that claim. Defendant City of Lincoln's Motion for Summary Judgment as to Plaintiff's negligence claim will be granted, as the negligence claim is barred by § 13-910(7) of the Nebraska Political Subdivisions Tort Claims Act. Accordingly,

IT IS ORDERED:

1.      The Motions for Summary Judgment (Filing Nos. 73, 74, 75) filed by Defendants Graham, Peth, Wayne, Winkler, and Moore on Plaintiff's false-arrest claim are denied because such Defendants are not entitled to qualified immunity on Plaintiff's false-arrest claim;

2.      The Motion for Summary Judgment (Filing No. 75) filed by Defendants Murphy and Drager as to Plaintiff's false-arrest claim is granted for lack of personal involvement in the constitutional violation at the arrest stage;

3.      The individual Defendants' Motions for Summary Judgment (Filing Nos. 73, 74, 75) on Plaintiff's excessive-force claim are denied because the Defendants are not entitled to qualified immunity on Plaintiff's excessive-force claim;

4.      Defendant City of Lincoln's Motion for Summary Judgment (Filing No. 72) as to Plaintiff's negligence claim is granted because the negligence claim is barred by § 13-910(7) of the Nebraska Political Subdivisions Tort Claims Act; and

5.      The only claims remaining in this lawsuit are (a) Plaintiff's false-arrest claim against Defendant Lincoln Police Officers Graham, Peth, Wayne, Winkler, and Moore in their individual capacities, and (b) Plaintiff's excessive-force claim against Defendant Lincoln Police Officers Graham, Peth, Wayne, Winkler, Moore, Murphy, and Drager in their individual capacities.

DATED this 29th day of October, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge